## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

| | | |
|---|---|---|
| Ira Craig Baxley, | ) | C/A No. 3:07-cv-04067-CMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | **OPINION & ORDER** |
| v. | ) | **GRANTING MOTION** |
| | ) | **FOR SUMMARY JUDGMENT** |
| Robert Ward and Jon E. Ozmint, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Through this action Plaintiff, a former state employee, seeks recovery under 42 U.S.C. § 1983 for his alleged constructive discharge. Plaintiff alleges that he was constructively discharged from the South Carolina Department of Corrections ("SCDC") in retaliation for speech protected under the First Amendment, as applied to the states through the Due Process Clause of the Fourteenth Amendment. *See Gitlow v. New York*, 268 U.S. 652, 666 (1925). Plaintiff also asserts a pendent state tort claim for intentional infliction of emotional distress.

This matter is now before the court on Defendants' motion for summary judgment, filed pursuant to Fed. R. Civ. P. 56. For the reasons stated below, the motion is granted in full.

## BACKGROUND

Plaintiff began working for SCDC in 1985, with an initial assignment to Central Correctional Institution ("CCI"), a now-defunct state prison. Less than a year after his employment with SCDC began, Plaintiff joined what is now called the Rapid Response Team ("RRT"), an agency-wide unit that responds to critical incidents at various institutions around the state to deal with crowd control, perimeter security issues, work stoppages, and lesser disturbances. *See* Dkt. No. 57-1 at 2 n.3; Dkt.

No. 67-2 at 3-4 (Pl.'s WCC Dep. at 20-21).[1]  In 1987, Plaintiff joined the Special Operations Response Team ("SORT"), a more specialized unit that responds to higher threat disturbances such as riots, assaults, hostage situations, and prison takeovers.  SORT also assists the South Carolina Law Enforcement Division ("SLED") with narcotics operations.  *See* Dkt. No. 67-1 at 5 (Pl.'s Dep. at 7).  While serving on SORT, Plaintiff also worked at other institutions including the now-closed State Park Correctional Center and both the Campbell and Watkins Pre-Release institutions.  *See* Dkt. No. 59-5 at 8-11 (Pl.'s WCC Dep. at 26, 28, 30-31).  Plaintiff received various promotions during his time with SCDC, reaching the rank of Captain by 2002.  *See* Dkt. No. 57-1 at 2.

**2002 Application for SORT Major.**  In January 2002, Plaintiff applied for promotion to the rank of Major with SORT.  This promotion would have given Plaintiff increased responsibility and a pay supplement of $2,500.  During one of several interviews for the promotion, then-Director of Operations Ken McKellar asked Plaintiff whether he would assist in executions of condemned inmates.  Plaintiff responded affirmatively.  Dkt. No. 67-2 at 15 (Pl.'s WCC Dep. at 46) ("I told him, 'As far as I know, I don't have a problem doing it.'").  Plaintiff testified that there was an implication from SCDC officials that his promotion was contingent upon an affirmative response to this question.  *Id.* at 17-18 (Pl.'s WCC Dep. at 50, 52).  Plaintiff received the promotion to Major with SORT on January 17, 2002.  *Id.* at 9 (Pl.'s WCC Dep. at 40).

**2002-2007 Executions and Meetings with Ward.**  Plaintiff participated in his first execution in August 2002.  *See* Dkt. No. 67-2 at 31-33 (Pl.'s WCC Dep. at 87-89).  Plaintiff testified that he experienced emotional upset and religious and ethical conflict following this execution.  *Id.*;

---

[1]  Plaintiff has also filed a claim with the South Carolina Workers' Compensation Commission.  *See infra* pp. 6-7.  His deposition taken in that action is referred to throughout this order as "Pl.'s WCC Dep."

*see also* Dkt. No. 67-3 at 3-4 (Pl.'s WCC Dep. at 93-94). Plaintiff assisted in three other executions, including one with Major Terry Bracey ("Bracey"),[2] prior to April 2004. Dkt. No. 67-3 at 7-9 (Pl.'s WCC Dep. at 103, 106-07). Plaintiff continued to experience emotional upset related to performing executions. *See id.* at 11 (Pl.'s WCC Dep. at 111); 25-26 (Pl.'s WCC Dep. at 140-41). Unlike the officers who merely assist with preparations for executions, those who actually perform executions are not part of the debriefing sessions designed to help officers deal with the emotional effects of carrying out the execution process. *See* Dkt. No. 67 at 4. Consequently, Plaintiff did not receive debriefing or other counseling. Plaintiff also lacked training to serve as an executioner. Dkt. No. 67-2 at 30-31 (Pl.'s WCC Dep. at 86-87).

In April 2004, Plaintiff and Bracey met with Director of Operations Robert Ward to inform him that they no longer wished to perform executions. Ward explained to Plaintiff that if he no longer wished to perform executions, he could be transferred back to an institution. Such a transfer would have resulted in the loss of Plaintiff's state vehicle and his monetary supplement for serving as a Major with SORT. Dkt. No. 67 at 3; Dkt. No. 67-3 at 5-6 (Pl.'s WCC Dep. at 95-96). After the April meeting, Plaintiff performed another execution. *See* Dkt. No. 47-8 at 3 (Pl.'s WCC Dep. at 123). In May 2004, Plaintiff and Bracey again went to Ward to notify him of their unwillingness to continue to perform executions. Ward again responded that Plaintiff would have to perform executions or return to work at the institutional level. Dkt. No. 67-3 at 20-21 (Pl.'s WCC Dep. at 127-28). Between the May 2004 meeting and Plaintiff's departure from SCDC in April 2007, he performed at least five more executions. *See* Dkt. No. 67 at 3.

**2006 Hostage Situation.** Plaintiff's duties with SORT required him to respond to hostage

---

[2] Bracey is the plaintiff in a related suit, *Bracey v. Ward*, 3:07-04068-CMC.

situations in the prisons. On November 3, 2006, a male inmate took a female employee hostage at Ridgeland Correctional Institution. During the hostage situation, the female employee was able to inform the SORT team that she had been raped by the inmate. Plaintiff readied officers to address the hostage situation, but Ozmint did not permit Plaintiff and other officers to proceed. Dkt. No. 67-3 at 12-13 (Pl.'s WCC Dep. at 116-17). During the thirteen-hour standoff, the hostage was raped twice more and sodomized. *Id.* at 13, 17 (Pl.'s WCC Dep. at 117, 121). Plaintiff has testified that Ozmint's stated reason for the delay was to avoid using lethal force, but he believes Ozmint's actual reason for delaying entry was to avoid negative publicity in light of the upcoming November 7, 2006 gubernatorial election. Dkt. No. 67-3 at 13-14, 16, 19 (Pl.'s WCC Dep. at 117-18, 120, 123).[3]

**2007 Sheedy Computer Incidents and Plaintiff's Reports.** Plaintiff testified that, at some point in early 2007, then-Security Division Director Michael Sheedy called Plaintiff, Bracey, Assistant Division Director John Ferraro, and another employee into his office to view pornography on his work computer. These pornographic pictures were allegedly emailed to Sheedy by another SCDC employee. Dkt. No. 67-3 at 28-29, 33 (Pl.'s WCC Dep. at 166-67, 171). Plaintiff and Bracey went to Ferraro, their immediate supervisor, to complain about the incident, even though Ferraro was allegedly present when it occurred.[4] *Id.* at 29 (Pl.'s WCC Dep. at 167). Plaintiff believes that, although Ferraro met with Sheedy regarding the inappropriate use of his work computer, Sheedy

---

[3] Defendants note that the hostage taking incident was reviewed by the National Institute of Corrections and found to have been handled appropriately. Dkt. No. 69 at 3 n.4. For purposes of this order, however, the court accepts Plaintiff's version of events to the extent supported by a proffer of evidence.

[4] Ferraro, as Assistant Division Director, was presumably subordinate to Sheedy, Division Director. Thus, Ferraro may have lacked direct authority to reprimand Sheedy for allegedly viewing and sharing pornography on his work computer.

continued to invite various SCDC employees–but no longer Plaintiff–into his office to view these types of pictures. *Id.* at 30 (Pl.'s WCC Dep. at 168).

At some point after Plaintiff and Bracey's report to Ferraro but before Plaintiff's May 2007 departure from SCDC, Plaintiff entered Sheedy's office to use his computer because it was the only computer in the office with speakers. Plaintiff saw the pornographic emails in Sheedy's inbox and decided to gather them as evidence to share with Ozmint and Ward. Plaintiff videotaped the images on the computer with a state-owned video camera and took still photographs of the inappropriate images with his personal digital camera. He took the digital camera home, but placed the videotape in an envelope and left it in his office. Dkt. No. 67-3 at 30-32 (Pl.'s WCC Dep. at 168-70).

In late April or early May 2007, approximately one month after collecting his evidence of the pornography incidents, Plaintiff spoke first with Ozmint and later with SCDC Inspector General Daniel Murphy to report the pornography incidents. Dkt. No. 67-1 at 7 (Pl.'s Dep. at 27); *see also* Dkt. No. 67-3 at 32-33 (Pl.'s WCC Dep. at 170-71). Plaintiff believed that his meetings with Murphy and Ozmint would lead to an investigation by the Division of Investigation into whether Sheedy violated personnel policy by viewing these emails on his work computer and sharing them with other SCDC employees. Dkt. No. 67-1 at 8-9 (Pl.'s Dep. at 28-29). It is unclear whether such an investigation was ever conducted. However, Sheedy eventually learned that Plaintiff was responsible for reporting the pornography incidents. Plaintiff testified that, after learning of Plaintiff's report, Sheedy retaliated by excluding Plaintiff from meetings, by having him followed, and by generally treating him differently from other employees. Dkt. No. 67-1 at 10-11 (Pl.'s Dep. at 30-31).

5

**Internal Hostile Work Environment Complaint.** On or about May 7, 2007,[5] Plaintiff filed an internal hostile work environment complaint regarding Sheedy's alleged mistreatment. The complaint form states, in part, that as a result of Plaintiff's vocal disapproval of Sheedy's pornographic emails, "Mr. Sheedy has excluded me from meetings that others in my office have been involved in. Mr. Sheedy will barely speak or look at me. He has apologized to everyone in the office except for me, for his blatent [sic] disregard for policy." Dkt. No. 57-2. The complaint also states that Plaintiff believed the proper remedy would be temporary removal of Sheedy from his position during any investigation. *Id.* According to Plaintiff, Ozmint's response to the complaint was to notify Plaintiff that he could request a transfer. Plaintiff was dissatisfied with this response. He believed that Sheedy should have been temporarily reassigned, in part because Plaintiff had been working for SCDC longer than Sheedy. Dkt. Nos. 67-1 at 12 (Pl.'s Dep. at 37); 67-3 at 34-37 (Pl.'s WCC Dep. at 174-76, 179). Plaintiff's hostile work environment complaint was unsuccessful. Dkt. No. 6 at 3 (Am. Compl. ¶ 15).

**End of Employment with SCDC and Medical Disability Application.** Sometime prior to May 2007, Plaintiff petitioned the South Carolina State Retirement System for medical disability retirement. After initial assessment in May 2007, Plaintiff's psychologist, Dr. Lawrence Bergmann, recommended that Plaintiff refrain from returning to work. Dkt. No. 67-3 at 48-49 (Pl.'s WCC Dep. at 225-26); Dkt. No. 67-5 ¶ 7 (declaration of Dr. Bergmann). Dr. Bergmann "was not sure if he would be able to return to work at all." *Id.* Dr. Bergmann diagnosed Plaintiff with generalized anxiety disorder and concluded that "[t]he primary cause of [Plaintiff's] generalized anxiety disorder

---

[5] Plaintiff signed the document on May 3, 2007, but it is marked as received by the SCDC official on May 7, 2007. *See* Dkt. No. 67-1 at 9-10 (Pl.'s Dep. at 29-30). The precise date is of no consequence to this order.

was his duties as an executioner." *Id.* ¶ 8.  Plaintiff's disability retirement petition was granted and he discontinued his employment with SCDC in May 2007.  Dkt. No. 67-3 at 48 (Pl.'s WCC Dep. at 225).

**Civil Action and Workers' Compensation Claim.**  Defendant initiated this civil action on December 18, 2007, and filed an Amended Complaint shortly thereafter on December 21, 2007.  *See* Dkt. Nos. 1, 6.  The Amended Complaint asserts two causes of action: (1) a claim under 42 U.S.C. § 1983 for violation of Plaintiff's speech and associational rights granted by the First Amendment to the United States Constitution; and (2) a pendent state law tort for intentional infliction of emotional distress.  *See* Dkt. No. 6 at 4-5 (Am. Compl. ¶¶ 20, 23-25).  Plaintiff seeks compensatory and punitive damages under both causes of action.  Dkt. No. 6 at 4-6 (Am. Compl. ¶¶ 21, 26).

In addition, Plaintiff filed a Workers' Compensation claim with the South Carolina Workers' Compensation Commission on December 15, 2008, nearly a year after commencement of the present case.  Plaintiff's petition for a Workers' Compensation hearing states that Plaintiff suffers from post-traumatic stress disorder and psychological injury because he "was required to execute a number of condemned inmates without proper controls and safe guards [sic] . . . . If [Plaintiff] had refused to conduct the executions, it had been made clear . . . that his desirable employment would end . . . ."  Dkt. No. 57-3 at 1.  A joint Workers' Compensation hearing for Plaintiff and Bracey took place on June 5, 2009.  *See* Dkt. No. 60-2 at 1 (Workers' Comp. hearing transcript excerpts).  The court is unaware of the outcome of Plaintiff's Workers' Compensation claim.

## STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the nonmoving party has the ultimate burden of proof on an issue, the moving party must identify the parts of the record that demonstrate the nonmoving party lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In a First Amendment retaliation case, the court "review[s] the record to determine whether a reasonable jury could conclude that [the adverse employment action] was substantially motivated by . . . protected speech . . . ." *Love-Lane v. Martin*, 355 F.3d 766, 780 (4th Cir. 2004) (internal quotations omitted).

## DISCUSSION

Plaintiff asserts two claims. First, Plaintiff alleges that Defendants violated the First Amendment by constructively discharging him from SCDC in retaliation for two instances of protected speech: (1) comments regarding his participation in the execution of condemned inmates; and (2) his speech regarding Sheedy's use of a state-owned computer to view pornographic pictures. Second, Plaintiff alleges that Defendants engaged in conduct that amounts to intentional infliction of emotional distress.

## I. First Amendment Retaliation

To make a *prima facie* case in support of his First Amendment retaliation claim, Plaintiff must establish four elements: (1) The speech must have been protected expression, meaning that it related to a matter of public concern and was beyond Plaintiff's official duties; (2) Plaintiff's interest in exercising his First Amendment expression right must outweigh Defendants' interest in an efficient workplace;[6] (3) Plaintiff must have been deprived of a valuable benefit or adversely affected in a way that would chill exercise of his First Amendment rights; and (4) There must be a causal relationship between the protected expression and the deprivation or adverse employment decision. *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 351-52 (4th Cir. 2000) (listing elements). "[T]he first three elements are ultimately questions of law," while "[t]he fourth factor – one of causation – is one of fact." *Id.* at 352. If Plaintiff fails to establish any of these elements, his claim fails. "The order of inquiry may vary with the circumstances of the case." *Id.* (quoting *Daniels v. Quinn*, 801 F.2d 687 (4th Cir. 1986)).

**Protected Expression.** Plaintiff claims that he engaged in two instances of protected speech: (1) expressing his disdain for performing executions to Ward and others; and (2) notifying Ozmint and Murphy of inappropriate materials on Sheedy's computer. *See* Dkt. No. 67 at 13-14.

Because "[p]rotection of the public interest in having debate on matters of public importance" is a fundamental First Amendment principle, the Amendment protects government employees from termination or demotion in retaliation for speaking on a matter of public concern. *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998). "Speech involves a matter of public concern

---

[6] This element is also known as the *Pickering* balancing test, derived from *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). *See Love-Lane v. Martin*, 355 F.3d 766, 776 (4th Cir. 2004).

when it involves an issue of social, political, or other interest to a community." *Campbell v. Galloway*, 483 F.3d 258, 267 (4th Cir. 2007) (quoting *Kirby v. City of Elizabeth City*, 388 F.3d 440, 446 (4th Cir. 2004)) (holding that a brief passage in an employee's memorandum to her supervisor alleging generalized sexual harassment constituted protected speech). Employee statements that merely air "[p]ersonal grievances, complaints about conditions of employment, or expressions about other matters of personal interest" are not entitled to First Amendment protection. *Stroman v. Colleton County School Dist.*, 981 F.2d 152, 156 (4th Cir. 1992) (concluding that a teacher's letter alleging that a school district and officials mismanaged the budget represented protected speech, but holding, nonetheless, that Plaintiff's interest in expressing these concerns was outweighed by Defendants' interests and obligations).

When determining whether a matter is of public concern, the court "do[es] not focus on the inherent interest or importance of the matters discussed by the employee. Rather, [the court's] task is to decide *whether the speech at issue in a particular case was made primarily in the plaintiff's role as citizen or primarily in his role as employee.*" *DiMeglio v. Haines*, 45 F.3d 790, 805 (4th Cir. 1995) (emphasis added) (internal quotations omitted). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Campbell*, 483 F.3d at 267 (quoting *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)). As the Supreme Court has recently explained, the First Amendment does not shield public employees from the consequences of expressing themselves if their speech was undertaken as part of their official responsibilities. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate

their communications from employer discipline.").

**Complaints About Executions.** Plaintiff claims that his complaints about participating in executions were in the public interest, and therefore protected, for two reasons. First, he asserts that "[t]he public has a legitimate interest in knowing that those who serve as executioners do so under duress." Dkt. No. 67 at 14. Plaintiff also asserts that "[t]he public . . . has a legitimate interest in knowing that those who serve as executioners are not given proper training or counseling." *Id.*

With respect to the issue of inadequate training and counseling, Plaintiff's claim fails because, even if the court assumes that this issue is a matter of public concern, Plaintiff has not proffered evidence that he complained about these issues to Ward, Ozmint, other SCDC officials, or any persons outside of SCDC. *Compare* Dkt. No. 67-2 at 29-30 (Pl.'s WCC Dep. at 85-86) (describing Plaintiff's current views on the death penalty) *with* Dkt. No. 67-3 at 5-6 (Pl.'s WCC Dep. at 95-96) (describing Plaintiff's and Bracey's April 24, 2004 meeting with Ward). Plaintiff's testimony regarding the April 24, 2004 meeting between himself, Bracey, and Ward reflects discussion only of Plaintiff's and Bracey's personal complaints. For example, Plaintiff testified that he, along with Bracey, told Ward that performing the executions "was bothering [him], . . . taking a toll on [him] . . . ." *Id.* at 5 (Pl.'s WCC Dep. at 95). Accordingly, the court concludes that Plaintiff did not bring to light any concern of "social, political, or other interest" to the community, as required under First Amendment retaliation doctrine, in his meetings with Ward. *Campbell*, 483 F.3d at 267.

Plaintiff's claim regarding the issue of duress is likewise unavailing. Plaintiff claims that, when he was interviewed for a promotion to Major with SORT, he believed that he would not receive the promotion unless he assented to performing executions. For that reason, Plaintiff agreed

11

to perform executions. Dkt. No. 67-2 at 17-18 (Pl.'s WCC Dep. at 50, 52). The proffered evidence indicates that Plaintiff went to Ward and Ozmint to express concern about his job duties, and that, upon hearing his complaints, both Defendants told him that he either had to perform the executions or take on a different role at SCDC. *See* Dkt. No. 67 at 14.

The court finds that Plaintiff's complaints did not address a matter of public concern, and therefore, do not constitute protected speech. Although participation in executions under duress may constitute a matter of public concern under some circumstances, the "content, form, and context" of Plaintiff's statements suggest that Plaintiff's speech concerned only the narrow issue of his personal employment status within SCDC. *See Connick*, 461 U.S. at 147-48. Whether participation in executions is a condition of receiving certain promotions within SORT is not a matter of public concern because it does not "involve[] an issue of social, political, or other interest to a community." *Campbell*, 483 F.3d at 267. Instead, this question is an internal policy and personnel issue that is of limited interest to the public.

For these reasons, Plaintiff's expression of reservations about participating in executions does not constitute speech protected under the First and Fourteenth Amendments to the United States Constitution. To the extent that Plaintiff's First Amendment claim rests on these allegations, Defendants' motion for summary judgment is granted.

**Reports About Inappropriate Use of State Computer.** Plaintiff's second protected speech argument is more persuasive. Plaintiff asserts that he engaged in protected speech by notifying Ozmint and Murphy that Sheedy had been using a state-owned computer to view and show pornography to other SCDC employees. Dkt. No. 6 at 2-3 (Am. Compl. ¶¶ 11-16); *see also* Dkt. No 67-3 at 28-33 (Pl.'s WCC Dep. at 166-73) (describing incidents involving pornography on Sheedy's

office computer and Plaintiff's response to these incidents).  Plaintiff argues that his notification to Ozmint and Murphy is protected speech because the public has an interest in knowing about misuse of state property.

In a recent decision, the Fourth Circuit held that an employee's letter to her supervisor raised issues of public concern despite focusing primarily upon personal grievances.  This was because a "small portion" of the letter contained complaints about workplace sexual harassment of persons other than the plaintiff.  *Campbell*, 483 F.3d at 267; *see also id.* at 269-70 (detailing the employee's complaints and noting that, because they "involve[d] improper treatment of members of the public" as well as the employee, and because the memo spoke "in much broader terms" about sexual harassment in the workplace, the plaintiff "was seeking to challenge the practice within the department as much as she was seeking a resolution of her own complaint.").

The *Campbell* court relied on the Supreme Court's 1983 decision in *Connick* and its own 1992 decision in *Stroman* to establish a fairly liberal test for whether a public employee's speech deals with a matter of public concern.  In *Connick*, the Court proceeded to the next step of First Amendment retaliation analysis because "*one of the questions* in [plaintiff's] survey touched upon a matter of public concern, and contributed to her discharge . . . ."  483 F.3d at 267 (emphasis in original) (quoting 461 U.S. at 149).  Similarly, in *Stroman*, the court explained that it prefers to proceed to the *Pickering* balancing test "[w]hen speech *arguably* relates to a matter of public concern . . . ."  981 F.2d at 158 (emphasis added).

Defendants argue that Plaintiff's reports of Sheedy's computer misuse are not protected speech for three reasons: (1) such inappropriate use is an "internal personnel matter," and therefore not a matter of public concern; (2) Plaintiff discussed the issue with Ozmint only after Plaintiff's

counsel raised the issue in cross-examination of Ward in another civil action, *Anthony v. SC Dep't of Corrections*, 3:05-1636-MBS-BM (Apr. 27, 2007); and (3) the emails that allegedly contained pornography were only "sophomoric and in poor taste" and did not "involve[] any criminal conduct." Dkt. No. 57-1 at 8-9 (Defs.' Mem. in Supp. of Summ. J); *see also id.* at 4. Of these arguments, the first is the most persuasive, although the court concludes that it is not so persuasive as to support summary judgment, for reasons discussed below.

Whether speech is subject to First Amendment protection turns, in part, on whether the public employee is speaking as an employee or as a citizen. *See DiMeglio*, 45 F.3d at 805. The mere fact that the speech occurs within the employing organization and is directed to a supervisor does not, however, preclude a finding that the employee's speech was in his role as a citizen. *See Garcetti v. Ceballos*, 547 U.S. 410, 420-21 (2006) ("That [plaintiff] expressed his views inside his office, rather than publicly, is not dispositive. Employees in some cases may receive First Amendment protection for expressions made at work."). Likewise, the fact that the speech involves or touches on Plaintiff's employment does not preclude a finding that the speech is on a matter of public concern. *Id.* ("The memo concerned the subject matter of [plaintiff's] employment, but this, too, is nondispositive. The First Amendment protects some expressions related to the speaker's job.").

The record does not reflect the precise content of Plaintiff's statements. The proffered evidence does, however, suggest that Plaintiff brought the improper use of state-owned computer equipment to his supervisors' attention. In doing so, he expressed his own discomfort and also suggested that Sheedy's actions were inappropriate as directed toward other employees and

constituted misuse of state property.[7]  The concerns other than Plaintiff's own discomfort may constitute matters of public concern.  *See Stroman*, 981 F.2d at 157-58 (agreeing with employer that employee's "personal grievance" prompted speech but finding that employee's speech regarding budgetary mismanagement arguably related to a matter of public concern).  This is true regardless of whether SCDC has a policy regarding the proper use of state-owned computer equipment because, even absent a policy, it is arguable that the use of state resources to view pornography, or a supervisor's sharing of such material with subordinates, is a matter of public concern.

Accordingly, the court agrees with Plaintiff that misuse of state property and a supervisor's sharing of pornography with subordinates are at least potentially matters of public concern.[8]  The court therefore progresses to the remaining steps of First Amendment retaliation analysis.  *See*

---

[7]  Plaintiff testified that when he and Bracey initially complained to Ferraro about Sheedy's inappropriate computer use, Plaintiff told Ferraro, "[Y]ou need to talk to Mr. Sheedy about this, and, you know, I don't like it, I don't condone it."  Dkt. No. 67-3 at 29-30 (Pl.'s WCC Dep. at 167-68).  These statements were directed to the prurient nature of the photos Sheedy showed Plaintiff and other employees.

[8]  As noted above, Defendants raised two other arguments in favor of summary judgment on this issue.  These arguments are without merit.  Defendants' assertions that Plaintiff only reported the incident (at least to Ozmint) after he stopped active employment and did so for the purpose of deflecting attention from his own improper actions fail because they ignore contrary evidence.  For example, Plaintiff testified that he made several reports, including to his immediate supervisor, Ferraro, because he felt the computer usage was inappropriate.  Plaintiff also testified that Sheedy treated Plaintiff less favorably after the reports including by excluding Plaintiff from meetings.  *See* Dkt. No. 67-3 at 29-30 (Pl.'s WCC Dep. at 167-68).  Given the alleged retaliatory treatment, the reports are alleged to have occurred while Plaintiff was still actively employed.  Likewise, Plaintiff's testimony as to his motivations contradicts Defendants' proffered alternative interpretation.

Defendants' reliance on the lack of criminality in Sheedy's alleged behavior is, likewise, unavailing.  To determine whether a matter is of public concern, the court examines whether the employee's speech "involves an issue of social, political, or other interest to a community."  *Campbell v. Galloway*, 483 F.3d 258, 267 (4th Cir. 2007) (quoting *Kirby v. City of Elizabeth City*, 388 F.3d 440, 446 (4th Cir. 2004)).  There is no requirement that the activity at issue rise to the level of a criminal offense.

*Stroman*, 981 F.2d at 158 (holding that the court would consider the remaining elements if it is even *arguable* that the plaintiff's speech addressed a matter of public concern).

**Causation.** Because the court finds it dispositive, the court next addresses whether Plaintiff has proffered sufficient evidence of causation to allow submission of his First Amendment claim to the jury. In addressing this element, the court considers only the causative link between the speech which is arguably subject to First Amendment protection (complaints about Sheedy's computer usage) and the harm which allegedly resulted (constructive discharge).

To establish causation, Plaintiff must show that "the protected speech was a 'substantial factor' in the decision to take the allegedly retaliatory action." *Goldstein*, 218 F.3d at 352 (quoting *McVey*, 157 F.3d at 277-78). The court must "review the record to determine whether a reasonable jury could conclude that [the alleged adverse employment action] was 'substantially motivated by . . . protected speech; if a reasonable jury could reach this conclusion, then [the issue must be resolved through] trial.'" *Love-Lane*, 355 F.3d at 780 (quoting *Goldstein*, 218 F.3d at 357).

There is evidence that Plaintiff complained about Sheedy's misuse of a state computer. There is also evidence that, after these reports, Sheedy began treating Plaintiff less favorably than other employees. For example, in his internal hostile work environment complaint, Plaintiff stated that, after he made these reports: "Mr. Sheedy has excluded me from meetings that others in my office have been involved in. Mr. Sheedy will barely speak or look at me. He has apologized to everyone in the office except for me . . . ." *See* Dkt. No. 57-2; *see also* Dkt. No. 67-3 at 35-36 (Pl.'s WCC Dep. at 175-80). The timing of the change in treatment, as well as the selective apology are sufficient to suggest a causative link between Plaintiff's complaints about Sheedy's computer usage and Sheedy's allegedly retaliatory actions thereafter.

Sheedy's alleged retaliatory actions are not, however, enough to support a finding of constructive discharge.[9] Rather, they at most suggest some hostility and harsher than usual treatment in the workplace. Thus, even accepting that there is evidence of some retaliatory action linked to Plaintiff's reports about Sheedy's computer usage, there is insufficient evidence to link the computer usage reports to anything which might support a claim of constructive discharge.

This conclusion is further supported by Plaintiff's contemporaneous justification for his departure from active employment. As Defendants note, Plaintiff ceased active employment when he took medical disability leave on the advice of his doctor. That doctor opined that Plaintiff was suffering from psychological disturbance caused by his participation in executions. *See* Dkt. No. 67-5 ¶¶ 7 ("After an initial assessment of Mr. Baxley, I recommended that he not return to work, and was not sure if he would be able to return to work at all"); *id.* ¶ 8 ("The primary cause of [Plaintiff's] generalized anxiety disorder was his duties as an executioner"); *see also* Dkt. No. 47-9 at 4 (Pl.'s WCC Dep. at 191-92) (listing the mental health specialists that Plaintiff saw prior to taking disability leave in May 2007). Plaintiff also filed an internal hostile work environment complaint one day before leaving work. While that complaint challenges Sheedy's allegedly harsh treatment, it does not suggest that this treatment was sufficient to constitute constructive discharge. *See* Dkt. No. 57 at 14.

---

[9] *See Long v. Dunlop Sports Group Ams., Inc.*, 506 F.3d 299, 303 (4th Cir. 2007) ("A constructive discharge occurs if an employer deliberately makes the working conditions intolerable in an effort to induce the employee to quit.") (internal citations and quotation marks omitted). Working conditions which are merely unpleasant are not, however, enough to support a claim for constructive discharge. *See Heiko v. Colombo Sav. Bank*, 434 F.3d 249, 262 (4th Cir. 2006) ("[M]ere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.") (internal citations and quotations omitted).

Plaintiff has not directed the court to any other evidence from which a reasonable jury could conclude that Sheedy's actions (or any other person's actions motivated by Plaintiff's reports of Sheedy's computer usage) rose to the level necessary to support a claim of constructive discharge. Consequently, Plaintiff has failed to proffer evidence that his reports of Sheedy's computer usage "substantially motivated" treatment sufficiently severe to support a constructive discharge claim.

**Deprivation of a Valuable Benefit & Balancing Test.** As discussed above, the essence of Plaintiff's claim is that he was subjected to conditions so intolerable as to support a constructive discharge claim. For purposes of this order, the court accepts that a constructive discharge would constitute deprivation of a valuable benefit. *Cf. Goldsmith v. Baltimore*, 987 F.2d 1064, 1072 n.10 (4th Cir. 1993) (noting that "the finding that no constructive discharge occurred is equally fatal to all of [plaintiff's] constitutional claims . . . .").

For reasons discussed above, however, the court concludes that the evidence is not sufficient to support a finding of a causative link between Plaintiff's complaints about Sheedy's computer usage and any conditions of employment sufficiently intolerable to constitute constructive discharge. While there is sufficient evidence to support a finding that Sheedy retaliated against Plaintiff with respect to some of his working conditions, the alleged retaliation and resulting conditions were not severe. At most, the retaliation led to a somewhat unpleasant working relationship with a second-level supervisor, including through exclusion from some meetings. Such actions do not constitute deprivation of a valuable benefit unless they result in a loss or reduction of income, job benefits, or job opportunities to which Plaintiff is entitled. *See generally Holland v. Rimmer*, 25 F.3d 1251, 1256-57 (4th Cir. 1994) (holding that plaintiff was not deprived of a valuable benefit when he received all pay and benefits to which he was entitled); *Royster v. Board of Trustees*, 774 F.2d 618,

621 (4th Cir. 1985) (same).[10]

For the reasons set forth above, the court concludes that Plaintiff has not proffered evidence that he was deprived of a valuable benefit as a result of any speech arguably subject to protection under the First Amendment. Given this conclusion, it is not necessary to determine whether Plaintiff's interests in his protected expression outweigh Defendants' interests in maintaining an efficient workplace.

## II. Qualified Immunity

Defendants argue that, even if the court finds that their actions violated Plaintiff's First Amendment rights, they are entitled to qualified immunity. Dkt. No. 57-1 at 27-28. "Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ridpath v. Board of Governors Marshall Univ.*, 447 F.3d 292, 306 (4th Cir. 2006) (internal quotation marks omitted). Qualified immunity analysis has two steps: As a threshold, the court must determine whether the facts alleged, viewed in the light most favorable to the plaintiff, evince violation of a constitutional right. If the facts support this initial inquiry, the court must decide "whether the contours of the right were clearly established such that a reasonable official would understand that his actions violated that right." *Campbell*, 483 F.3d at 266. Because Plaintiff does not satisfy the threshold by showing a constitutional violation, the court need not proceed to the second step of

---

[10] For purposes of this order, the court assumes that exclusion from meetings might, in some circumstances, lead to loss of job opportunities or otherwise adversely affect an employee's career and related benefits. Plaintiff has not, however, directed the court to any evidence that he suffered any harm beyond hurt feelings as a result of the alleged exclusion from meetings.

qualified immunity analysis.

## III. Intentional Infliction of Emotional Distress

Plaintiff also asserts a pendent state claim against Defendants for intentional infliction of emotional distress ("IIED"). Plaintiff claims that Defendants "forc[ed]" him to participate in executions against his will, and further claims that "[a]s a direct and proximate result" of performing executions under duress, "plaintiff has sustained the loss of his quality of life, shock, humiliation and embarrassment, as well as the loss of earning capacity." Dkt. No. 6 at 5-6 (Am. Compl. ¶¶ 24-26). Plaintiff also bases his IIED claim on "the retaliation imposed by Ozmint and Ward as set forth herein which is conduct not to be tolerated in a civilized society and which no reasonable human being should be required to endure." *Id.* at 5 (Am. Compl. ¶ 24).[11]

Because IIED is a state cause of action heard in the federal court through its supplemental jurisdiction, the court applies South Carolina law to this claim. In order to state a claim for IIED (or "outrage") under South Carolina law, Plaintiff must show that:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from his conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, and utterly intolerable in a civilized community; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was severe so that no reasonable [person] could be expected to endure it.

*Ford v. Hutson*, 276 S.E.2d 776, 778 (S.C. 1981) (internal citations and quotations omitted)

---

[11] The portion of the Complaint that sets forth Plaintiff's IIED claim appears to focus only on his participation in executions, and does not specifically mention the hostile work environment that allegedly resulted from Plaintiff's reports about Sheedy's inappropriate computer use. However, the Complaint does specifically incorporate all of the allegations in the preceding paragraphs including Paragraphs 11-16, which address Defendants' alleged retaliation against Plaintiff "in order to protect their friend and guilty subordinate," presumably Sheedy. *See* Dkt. No. 6 at 3 (Am. Compl. ¶ 16).

(establishing, for the first time, elements of an IIED claim in South Carolina); *see also Hansson v. Scalise Builders of S.C.*, 650 S.E.2d 68, 71 (S.C. 2007). "[T]he defendant's conduct is to be judged by an *objective standard*, i.e., whether it can reasonably be considered extreme, outrageous, and utterly intolerable in a civilized community." *Corder v. Champion Rd. Machinery International Corp.*, 324 S.E.2d 79, 81 (S.C. Ct. App. 1984) (emphasis added). At this stage of the civil action, "the court determines whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, and only where reasonable persons might differ is the question one for the jury." *Strickland v. Madden*, 448 S.E.2d 581, 584 (S.C. Ct. App. 1994).[12]

Plaintiff's allegations of maltreatment are not sufficiently outrageous to support his IIED claim. To the extent Plaintiff's IIED claim rests upon his alleged constructive discharge, his claim fails because, under South Carolina law, "allegations of retaliatory discharge, without more, are not sufficient to state a claim for outrage." *Corder*, 324 S.E.2d at 81. "While wrongful discharge for any reason is reprehensible conduct and may cause mental anguish to the discharged employee, it is not in itself the kind of extreme conduct which gives rise to a legal claim for outrage." *Id.*; *see also Alonso v. McAllister Towing of Charleston, Inc.*, 595 F. Supp. 2d 645, 649 (D.S.C. 2009). Plaintiff alleges only that Sheedy stopped speaking with him and inviting him to meetings. *See* Dkt. No. 6 at 3 (Am. Compl. ¶ 13); *see also* Dkt. No. 57-2 (Pl.'s internal hostile work environment complaint). Though Sheedy's behavior may have caused Plaintiff some mental upset, it is not

---

[12] Although, in the employment context, South Carolina's Workers' Compensation statute generally prohibits employee remedies other than those available under the Workers' Compensation program, it is nonetheless "well settled that a common law cause of action is not barred by [the exclusivity provision] *if the employer acted with a deliberate or specific intent to injure the employee*." *Peay v. United States Silica Co.*, 437 S.E.2d 64, 65 (S.C. 1993) (emphasis added); *see also* S.C. Code Ann. § 42-1-540. A claim for IIED would, by definition, require such an intent.

conduct that, viewed objectively, is "utterly intolerable in a civilized community." *Corder*, 324 S.E.2d at 81; *see also Gattison v. South Carolina State College*, 456 S.E.2d 414, 416-17 (S.C. Ct. App. 1995) (reviewing, in detail, what constitutes "outrageous conduct" according to South Carolina case law on IIED).

Plaintiff's participation in executions is likewise an insufficient basis for an IIED claim. Plaintiff alleges that Defendants required him to participate in executions against his will, for two reasons: (1) when Plaintiff was interviewing to be a major with SORT, he believed he would not receive the position unless he agreed to perform executions; and (2) once Plaintiff notified Ward that he no longer wished to perform executions, Ward allegedly told Plaintiff that if he did not perform executions, he would be sent back to work at a prison. *See* Dkt. No. 67-2 at 17 (Pl.'s WCC Dep. at 50); Dkt. No. 67-3 at 4-5 (Pl.'s WCC Dep. at 94-95); *see also* Dkt. No. 67-2 at 35 (Pl.'s WCC Dep. at 91) (further outlining Plaintiff's concerns that he not "be considered a wimp" after "sixteen or seventeen years of SORT to get to this level . . . ."). Plaintiff also argues that his "forced" participation in executions was outrageous because he was exposed to hazardous materials and emotionally troubling situations without preparation or training, among other reasons. *See* Dkt. No. 6 at 5 (Am. Compl. ¶ 25).

These allegations are insufficient to support a finding that Plaintiff was forced to participate in executions. At most, he was given a difficult choice with emotional repercussions. Jobs, particularly jobs in the field of law enforcement, sometimes require such tough choices. Further, even if Ward told Plaintiff that he would lose his position with SORT, state vehicle, and pay supplement if he declined to participate in executions, this type of employer conduct would not amount to the sort of extreme and outrageous conduct contemplated by the IIED cause of action.

*Cf. McSwain v. Shei*, 402 S.E.2d 890, 890-92 (S.C. 1991) (holding that a reasonable jury could determine that an employer was liable for IIED when the employer told plaintiff that she would be fired unless she repeatedly performed exercises that revealed her incontinence to bystanders and delayed surgery necessary to repair her bladder condition). Finally, Plaintiff has proffered no evidence that Defendants acted "with a deliberate or specific intent to injure" him. *See Peay*, 437 S.E.2d at 65. Instead, the proffered evidence proves only that Plaintiff was given a choice between duty assignments: one more difficult and potentially more hazardous, but offering greater benefits and compensation; the other less emotionally trying, but with a corresponding reduction in pay and benefits. The court therefore grants Defendants' motion for summary judgment as to Plaintiff's IIED claim.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **granted** in full.

**IT IS SO ORDERED.**

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
March 15, 2010